[Nos. H006185, H006532. Sixth Dist. Mar. 22, 1991.]

Conservatorship of the Estate of MARCIA FARRELL HART. WELLS FARGO BANK, as Conservator, etc., Petitioner and Respondent, v.
JOHN McPIKE KERESEY, Objector and Appellant.

**COUNSEL**

Gaffaney, Teal, Cudney & Gray, William R. Gaffaney and Catherine Lawson for Objector and Appellant.

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, John M. Rubens, Mark G. Bonino, Heather A. McKee and Linda Dvorak for Petitioner and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, J.**—Under Probate Code sections 2580 through 2586 a superior court may, upon the petition of any interested person and after consideration of all relevant circumstances, authorize or require a conservator to take actions of various kinds with respect to the conservatorship estate. In essence the statute permits the court to substitute its judgment for that of a conservatee.

Wells Fargo Bank (the Bank) is the conservator of the estate of Marcia Farrell Hart, an elderly person afflicted with Alzheimer's disease. In June 1989, when Hart's conservatorship estate was valued at approximately $13.2 million, the Bank petitioned under the substituted-judgment statute for authority to make, from the conservatorship estate, gifts totalling $670,000 in the first year and $70,000 in each of five succeeding years to Hart's living children and to certain of her grandchildren. One of the children, John McPike Keresey, objected. The superior court granted the requested authority and Keresey appealed (H006152); the appeal automatically stayed the superior court's order. (Prob. Code, § 2751, subd. (a).) The Bank then petitioned for an order that it make certain of the gifts notwithstanding the stay. (*Id.* subd. (b).) Keresey again objected. Again the

superior court made the requested order and again Keresey appealed (H006532). We have ordered the appeals consolidated.

Keresey asks that this court modify the superior court's orders in specified respects and affirm the orders as so modified; the Bank asks that the orders simply be affirmed. We shall adopt neither party's proposal. Instead we shall reverse the superior court's orders and remand the cause for further proceedings. The superior court was significantly misinformed as to relevant circumstances. We can neither reshape the substituted-judgment orders (as Keresey proposes) to fit the true circumstances nor assume (as the Bank suggests) that the superior court would have reached the same decision if fully informed. ▮ ▮▮▮▮ The substituted-judgment statute vests broad discretionary power in the superior court; we must return the cause to that court for its fully informed consideration.[1]

## 1. *The Substituted-judgment Statute*

The doctrine underlying the substituted-judgment statute was first recognized in California in *Estate of Christiansen* (1967) 248 Cal.App.2d 398 [56 Cal.Rptr. 505]. (Cf. also *Conservatorship of Wemyss* (1971) 20 Cal.App.3d 877, 880 [98 Cal.Rptr. 85].) *Christiansen* declared "that the courts of this state, in probate proceedings for the administration of the estates of insane or incompetent persons, have power and authority to determine whether to authorize transfers of the property of the incompetent for the purpose of avoiding unnecessary estate or inheritance taxes or expenses of administration, and to authorize such action where it appears from all the circumstances that the ward, if sane, as a reasonably prudent man, would so plan his estate, there being no substantial evidence of a contrary intent." (248 Cal.App.2d at p. 424.) Significantly, *Christiansen* did not require that a court find the ward *would have* acted as proposed; instead it adopted an

---

[1] There is a preliminary question as to Keresey's standing to bring and to maintain this appeal. Hart, whose interest was primarily compromised by the flaws in these proceedings, has not appealed and presumably was incapable of appealing. An appeal must be brought and maintained by someone with standing to do so. Because the orders on their faces provide for Keresey's immediate cash benefit we must ask whether Keresey is in the requisite sense aggrieved by either order. (Cf. *Estate of Armstrong* (1966) 241 Cal.App.2d 1, 6 [50 Cal.Rptr. 339]; Code Civ. Proc., § 902.) Further, Keresey's acknowledgment that he has received and retained the substantial gift authorized for him gives substance to Wells Fargo Bank's assertion that he has waived his right to maintain the appeal. Both questions are close. We conclude the potential diminution, by the authorized gifts to others, of Keresey's overall share of Hart's property sufficiently establishes that he is aggrieved, and the possibility that he was not fully informed when he accepted the $120,000 gift precludes a finding of clear, unmistakable, and voluntary waiver. (Cf. *Al J. Vela & Associates, Inc.* v. *Glendora Unified School Dist.* (1982) 129 Cal.App.3d 766, 769-770 [181 Cal.Rptr. 330]; cf. also *Lee* v. *Brown* (1976) 18 Cal.3d 110, 114-115 [132 Cal.Rptr. 649, 553 P.2d 1121]; *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 744 [131 Cal.Rptr. 873, 552 P.2d 1169].)

essentially objective prudent-person standard. Thus *Christiansen* contemplated *substitution* of the court's judgment for that of the incompetent person.

The substituted-judgment doctrine was codified in 1979, operative January 1, 1981 (Stats. 1979, ch. 726, § 3, pp. 2403-2405), upon the recommendation of the California Law Revision Commission which intended to "make[] clear that the court may authorize a conservator on behalf of the conservatee to perform a variety of acts that are necessary or desirable in modern estate planning or management." (Recommendation Relating to Guardian-Conservatorship Law (Nov. 1978) 14 Cal. Law Revision Com. Rep. (1978) p. 513.) Noting that *Christiansen* had empowered a guardian "to carry out the presumed donative intent of the ward," the commission suggested that "[t]he proposed law gives statutory recognition to the doctrine of substituted judgment and lists by way of illustration matters that are to be considered in applying the doctrine. At the same time, the proposed law gives the court discretion and flexibility in applying the doctrine under the circumstances of each case." (*Id.* at p. 556.)

The statute[2] permits a conservator to petition for an order authorizing a proposed action for any one or more of several purposes: to benefit the conservatee or the estate; to minimize current or prospective taxes or expenses of conservatorship or probate administration; or to provide gifts for such purposes and to such donees as would be likely beneficiaries of gifts from the conservatee. (Prob. Code, § 2580, subd. (a).) The proposed action may include, among other things, "[m]aking gifts of principal or income, or both, of the estate, outright or in trust." (*Id.* subd. (b)(1).)

The statute empowers the superior court, "in its discretion" and after a hearing, to "approve, modify and approve, or disapprove the proposed action" and to authorize or direct other action. (Prob. Code, § 2584.) But before it makes its decision the superior court must (1) provide for notice to various classes of persons (*id.* § 2581, subd. (c)), (2) determine (a) that the conservatee is not opposed to the action, or if opposed lacks legal capacity for the action, and (b) that the action either will have no adverse effect on the estate or will leave the estate adequate to provide for the conservatee and for the support of those the conservatee is legally obliged to support, taking all circumstances into account (*id.* § 2582), and (3) "[T]ake into consideration all the relevant circumstances, including but not limited to" specific circumstances enumerated in 11 categories (*id.* § 2583) recapitulated in a requirement that the court consider "[t]he likelihood from all the

---

[2] The substituted-judgment statute has been repealed and reenacted with cosmetic changes, effective July 1, 1991, as part of an overall reenactment of the Probate Code. (Stats. 1990, ch. 79, §§ 13, 14.) We quote from the pre-July 1, 1991, version.

circumstances that the conservatee as a reasonably prudent person would take the proposed action if the conservatee had the capacity to do so." (*Id.* subd. (k).) The Law Revision Commission commented that "[t]he listing in Section 2583 is not exclusive, and the weight to be given to any particular matter listed will depend upon the circumstances of the particular case . . . . A matter not listed may be significant in a particular case." (Com. on Prob. Code, § 2583, 14 Cal. Law Revision Com. Rep., *supra*, at p. 795.)

Our disposition of these appeals is primarily influenced by three broad generalizations compelled, in our view, by the statute viewed as a whole.

### a. *The Conservatee's Interests*

■ It is apparent that the substituted-judgment statute is designed, consistent with the Probate Code's conservatorship provisions as a whole, to protect the conservatorship estate for the benefit not only of the persons who will ultimately receive it from the conservatee or his or her personal representative but also (and perhaps primarily) of the conservatee himself or herself. It is, after all, the conservatee whose property is to be managed, applied, or (as in this case) given away. Common sense tells us that in many cases (as in this one) the conservatee will be incapable of protecting his or her own interests. It will thus be incumbent upon the conservator, upon any other petitioner, and upon the superior court itself to assure throughout substituted-judgment proceedings that the conservatee's interests are, indeed, protected. Where amounts are large or the stakes otherwise especially high, it may be prudent for the superior court to appoint a guardian ad litem, empowered to retain independent counsel, to protect the conservatee's personal interest.

### b. *Breadth of Superior Court Discretion*

The substituted-judgment statute conceptualizes the superior court's function as an exercise of judicial "discretion." ■ "The scope of discretion always resides in the particular law being applied . . . . Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." (*City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704].) As a practical matter it will be the task of a reviewing court to identify any abuse of discretion, and thus the scope of a superior court's discretion will be commensurate with the reviewing court's willingness to defer to the superior court's judgment. (Cf. *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1022 [213 Cal.Rptr. 712], disapproved on another point in *Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 479, fn. 4 [749 P.2d 339].) It has been suggested that, in general, greater

appellate deference "is warranted whenever the trial judge's 'nether position' in the judicial pyramid makes him a presumptively more capable decisionmaker . . . ." (*Id*. at p. 1024.)

■ The superior court's primary function under the substituted-judgment statute will be to make a decision (as the conservatee would if able) on the basis of information furnished to it. The information the superior court receives may or may not be consistent: If there are issues of fact the court of course must determine whether the issues are material to the decision to be made and then resolve any issues it deems material.

This is not to say that if the facts are undisputed, or are settled by judicial fact-finding, the decision to be made will follow as a matter of law. A given set of facts may permit more than one rational substituted-judgment decision.

The superior court will (as the conservatee would) obtain information, and hear applications and suggestions, from various sources, and will or should obtain a sense of the situation more or less analogous to that the conservatee might have had and inevitably more enlightened than any reviewing court could hope to obtain. In sum the superior court, when called upon to substitute its judgment for that of the conservatee, will be "a presumptively more capable decisionmaker" and should be given broad latitude.

c. *Importance of Complete Information*

■ If the superior court is to be able validly to substitute its judgment for that of the conservatee it must be given complete information as to all relevant circumstances. The conservator, and any petitioner other than the conservator, must bear the burden of informing the court fully and fairly. And in any case the superior court must on its own motion take all steps necessary to satisfy itself, as the conservatee's decisionmaking surrogate, that it has been fully and fairly informed.

2. *The Superior Court Record*

Such information as was placed before the superior court was essentially undisputed. Hart had five surviving adult children (two natural sons and three adopted daughters) and eight grandchildren of whom at least six were also adults. In the annual accounting period ending in 1989 the estate's cash receipts had exceeded total expenditures by slightly more than $80,000.

In 1983 Hart had executed a valid will. The will was not placed before the superior court but was referred to, and described in part, in the parties'

papers. It is undisputed that the will would disinherit one of the grandchildren, would make specific gifts of $25,000 to each of the seven remaining grandchildren, and would give 95 percent of the residue of Hart's estate to her five surviving children in equal shares. The shares of the two natural sons would be given outright; the shares of the three adopted daughters would be given in trust.

The Bank had previously been authorized to make "annual-exclusion" gifts to each of Hart's five surviving children, in the amount of the federal annual gift tax exclusion (which in 1989 was $10,000 per donee), in 1989 and in each of the following five years. By its June 1989 petition the Bank proposed a one-time gift of $120,000 from Hart's conservatorship estate to each of her five children "in order to utilize the full unified credit for gift and estate taxes which is equivalent to a gift totalling $600,000." The Bank also proposed annual-exclusion gifts, for a total of six years, to each of seven of Hart's grandchildren, omitting only the grandchild expected to be disinherited. The Bank proposed to fund the 1989 gifts by selling shares in a municipal bond fund and taking cash from a tax exempt fund, representing to the court that even after the gifts annual estate income would exceed annual disbursements.

The Bank reasoned that the proposed gifts would reduce income taxes during Hart's lifetime, and death taxes and costs of probate administration upon her death. The bank asserted that in light of the annual exclusion and the unified credit the proposed gifts would be "at no tax cost to the conservatee," but urged that the one-time gifts be made "at this time" in light of reported proposals to reduce the unified credit from $600,000 to as low as $100,000. The bank further alleged that the proposed gifts would be consistent with Hart's "past donative declarations, practices and conduct," and with Hart's relationship with, and the standard of living of, the donees, and that Hart "as a reasonably prudent person would take the proposed action if [she] had the capacity to do so." But the Bank tendered no evidence to support these conclusionary allegations.

Four of Hart's grandchildren joined in a memorandum of points and authorities in support of the Bank's petition, and they and one other grandchild, and four of Hart's five surviving children (including the conservator of Hart's person), expressly consented to the proposed gifts.

Keresey, the remaining child, implicitly accepted the Bank's premise that the full amount of the five one-time gifts would qualify for the unified credit, but opposed the Bank's petition on grounds that the "proposed estate planning actions" (1) "[d]o not reflect the choices Mrs. Hart would have made . . . ," (2) "[d]o not in fact achieve any of the [claimed] benefits . . . ,"

and (3) "[d]o not reflect an attempt to create a workable and effective estate plan which takes the estate's specific needs into consideration."

Two of Hart's grandchildren filed separate objections on some of the same grounds. All three objectors alluded to inter vivos trusts set up by Hart, many years earlier, for each of the grandchildren. Like Hart's will the inter vivos trust documents do not appear in the record, but the trusts were said to be "very generous" and to have provided for the grandchildren "quite handsomely."

After a hearing at which no additional evidence was received, the superior court granted the Bank's petition. Keresey appealed; the two objecting grandchildren did not.

Under subdivision (a) of Probate Code section 2751 Keresey's appeal automatically stayed the superior court's order. The Bank promptly petitioned, under subdivision (b) of section 2751, for an order directing it to distribute the five 1-time gifts of $120,000, and to distribute the annual-exclusion gifts to grandchildren in 1989 and 1990, notwithstanding the statutory stay. Subdivision (b) of section 2751 authorizes such an order only "for the purpose of preventing injury or loss to person or property . . . ." The Bank submitted no additional factual showing in support of its new petition, relying instead on an assertion that "[i]t is common knowledge that appeals generally take in excess of one . . . year before resolution" and on an argument, based on the showing previously made, that to delay distribution pending the appeal would cause "loss to and waste of the Conservatee's property."

In opposition to the Bank's new petition Keresey incorporated his opposition to the initial petition, arguing there had been no showing there would be any significant injury or loss to the estate. Keresey quoted from deposition testimony of a bank trust officer named Black. No transcript of Black's deposition was placed before the superior court.

Again no evidence was presented at hearing on the petition. After argument the superior court made the orders sought by the Bank. Again Keresey appealed.

3. *The New Evidence*

While these appeals were pending, and after he had filed his opening brief, Keresey made two motions in this court for consideration of evidence that had not been before the trial court when it ruled.

■ In nonjury matters California reviewing courts are empowered to make their own factual determinations and, "for the purpose of making the factual determinations or for any other purpose in the interests of justice," to take additional evidence. (Code Civ. Proc., § 909; cf. Cal. Const., art. VI, § 11.) The power has been narrowly construed: Most reviewing courts have applied to both factual determinations and evidence taking the rule of the leading case on findings at the appellate level that the power should be exercised "sparingly" and only to affirm the trial court's judgment with or without modification, or to reverse the judgment with directions to enter judgment for the appellant, and thus to end the lawsuit. (*Tupman* v. *Haberkern* (1929) 208 Cal. 256, 268-270 [280 P. 970]; cf., e.g., this court's recent decision in *Philippine Export & Foreign Loan Guarantee Corp.* v. *Chuidian* (1990) 218 Cal.App.3d 1058, 1090 [267 Cal.Rptr. 457].) Reviewing courts have refused to consider new evidence which is no more than cumulative of evidence already in the record (*Estate of Schluttig* (1950) 36 Cal.2d 416, 423 [224 P.2d 695]; *Donovan* v. *City of Santa Monica* (1948) 88 Cal.App.2d 386, 397 [199 P.2d 51]) or where "[n]o sound reason appears to explain why the evidence . . . '. . . was not produced or offered in the superior court,'" (*Estate of Schluttig, supra,* 36 Cal.2d at p. 423; cf. *People* v. *Benford* (1959) 53 Cal.2d 1, 7 [345 P.2d 928].) It has been stated that "[t]he procedure . . . is not a substitute for a motion for a new trial upon the basis of newly discovered evidence." (*Estate of Schluttig, supra,* 36 Cal.2d at p. 423.) The few reported instances in which reviewing courts have accepted new evidence as a basis for remand to the trial court rather than for an appellate judgment terminating litigation have relied on stipulations or concessions (e.g., *Estate of Wirt* (1929) 207 Cal. 106 [277 P. 118]), or on what the reviewing court regarded as particularly compelling equities (e.g., *Estate of Culver* (1947) 81 Cal.App.2d 640 [184 P.2d 738], limited in *Estate of Schluttig, supra,* 36 Cal.2d 416; *Bassett* v. *Johnson* (1949) 94 Cal.App.2d 807, 808 [211 P.2d 939] [the "effect on the appeal is decisive"], disapproved in *People* v. *Benford, supra,* 53 Cal.2d 1; *In re Marriage of Rhoades* (1984) 157 Cal.App.3d 169, 173 [211 Cal.Rptr. 531] ["[i]n keeping with the equitable nature of dissolution proceedings and in the interests of justice"], or on a civil adaptation of the writ of error *coram vobis* (*Rollins* v. *City and County of San Francisco* (1974) 37 Cal.App.3d 145 [112 Cal.Rptr. 168]; but cf. *Los Angeles Airways, Inc.* v. *Hughes Tool Co.* (1979) 95 Cal.App.3d 1 [156 Cal.Rptr. 805]; cf. also this court's opinion in *Monsan Homes, Inc.* v. *Pogrebneak* (1989) 210 Cal.App.3d 826) [258 Cal.Rptr. 676].

a. *Will and Deposition Transcript*

■ Keresey's first motion asked this court to accept and consider copies of Hart's will and of a transcript of Black's deposition. Both these items were relevant to issues raised in the superior court. Keresey suggests no

plausible reason why, in the exercise of reasonable diligence, the documents were not tendered to that court, and the documents would be cumulative of representations made to (and apparently accepted without dispute by) the superior court. Keresey's first motion will be denied.

b. *Gift Tax Return*

 Keresey's second motion tenders a copy of a federal gift tax return prepared for calendar year 1989 and filed by the Bank after this appeal was pending, to report the gifts the superior court had authorized. This evidence warrants an exception to the general rules we have outlined, and we shall grant Keresey's motion and consider the evidence.[3]

Since January 1, 1977, the federal Internal Revenue Code has provided a single set of graduated rates for both estate and gift taxes (26 U.S.C. §§ 2001, 2501, 2502) and an aggregate credit of up to $192,800 against gift taxes during the donor's lifetime and estate tax following his or her death. (*Id.* §§ 2505, 2010.) The gift and estate tax rates are graduated on the basis of all the gifts the donor has made during his or her lifetime and the size of his or her taxable estate at death. A donor who never made a taxable gift before January 1, 1977, and whose subsequent gifts were thus taxed beginning in the lowest tax bracket, could make up to a total of $600,000 in lifetime gifts (over and above annual-exclusion gifts of $10,000 or less) and bequests at death, free of tax, by virtue of the full $192,800 unified credit. But if the donor had made taxable gifts before January 1, 1977, his or her subsequent gifts and bequests would be taxed at higher rates and the credit would not cover as much value. Also, as to taxable gifts made after December 31, 1976, the donor would have been required to offset the tax to the full extent of any previously unused portion of the unified credit and thus to have reduced the credit balance thereafter available.

The Bank's representations that the five 1-time gifts would utilize the full unified credit and would be "at no tax cost to the conservatee" necessarily implied that Hart had made no previous gift subject to federal gift tax, and a fortiori had used no part of the unified credit.

Contrary to these implications, the 1989 gift tax return recites that Hart had previously made gifts totalling nearly $2.5 million, including gifts totalling $239,603 after December 31, 1976, for which she had "claimed" $47,000 in unified credits. Given this data our own arithmetic, based on the statutory tax rates and the Internal Revenue Service's long-standing ruling

---

[3] Keresey's motion also tenders a copy of an accounting, prepared by the Bank, as proof of the undisputed fact that the gifts were in fact made as authorized.

that a donor is obliged to apply the unified credit whether or not he or she chooses to "claim" it (Rev. Rul. 79-398, 1979-2 Cum.Bull. 338), indicates that in 1989, when the Bank filed its petition and the gifts were ostensibly made, Hart could have given no more than approximately $145,500 (over and above annual-exclusion gifts) free of federal gift tax, and that for the $600,000 in gifts she should have been required to pay more than $242,000 in federal gift tax.

We can readily rationalize *Tupman*'s relatively inflexible rule that an appellate court should undertake to resolve factual disputes only if by doing so it can terminate litigation. But we perceive a significant distinction, under Code of Civil Procedure section 909, between our authority to redetermine disputed facts with or without new evidence and our authority to take new evidence "for any other purpose in the interests of justice." We conclude that the special circumstances of record in this case authorize us to take further evidence in the interests of justice.

The most significant of the special circumstances is that the conservatee, whose present interest would most directly have been served by consideration of the gift tax return, was neither represented nor capable of representing herself before the superior court. One apparent premise for the generalization that appellate fact-gathering should not be a substitute for a timely new-trial motion is that in an adversary system interested parties may be required to learn the facts and to take timely action to protect their interests. That premise simply does not apply to this conservatee.

The gift tax return requires no fact-finding of this court. The Bank does not dispute the accuracy of the information in the return. The exact significance of the previous gifts—whether the superior court would have made the same or a different decision had it been fully informed—is not for us to decide.

Finally, what the evidence reveals above all is a serious breakdown in the administration of justice: Readily obtainable and obviously relevant information concerning enormous previous gifts simply was not produced in the superior court. We cannot disregard this.

For all these reasons we conclude we may properly consider the new evidence. The evidence requires that both the substituted-judgment order and the order under subdivision (b) of Probate Code section 2751 (hereafter section 2751) be reversed.

i. *The Substituted-judgment Order*

From the outset of our consideration of Keresey's first appeal we were troubled by the arguably superficial approach taken by the represented

parties to a proposal to make what were, in absolute terms, very large gifts from the conservatee's assets. In our view, given the need to respect and to safeguard the interests of a conservatee who could not speak for herself, not only the Bank but also Keresey should have been far more diligent to assure that the superior court knew everything a reasonable person in the conservatee's position would have wanted to know before deciding whether the gifts should be made. We cannot imagine, for example, why no one insisted Hart's will be made part of the record before the court. Nor do we understand why the Bank did not support its petition with much more detailed information as to the financial positions of Hart and of the proposed donees, including income, tax, and administrative-expense calculations. Many more examples could be stated.

The clearest example of all is the wholly unjustified failure to make known to the court that, contrary to the Bank's representations, Hart had previously made gifts aggregating nearly $2.5 million, and that nearly $240,000—almost 10 percent—of those gifts had been subject to the unified credit. In the course of proceedings the parties, including Keresey himself and the objecting grandchildren, referred to earlier gifts, apparently both outright and in trust, but no one pursued the matter until the end of briefing in this court.

Unquestionably, the new evidence of Hart's earlier gifts is significant to the question whether the superior court should have authorized the one-time gifts in the amounts proposed or at all. Our own arithmetic indicates that if the superior court could properly have assumed the conservatee would live at least three more years the significance of the information would have been primarily to the conservatee's current income and cash positions: The ultimate tax and administrative-expense impact would have been remote, speculative, but in any event relatively minimal. On the other hand, the difference in current cost to Hart's conservatorship estate, between the no-prior-gifts scenario on which the superior court presumably acted and the facts belatedly disclosed in the 1989 gift tax return, was in the order of $242,000 in currently incurred gift taxes. And if the 86-year-old conservatee were to die within three years after the proposed gifts were made, the gift tax itself would become part of her taxable estate for federal estate tax purposes and the total of her gift and her after-tax estate would be reduced.

A suggestion that these differences would be of little consequence when weighed against an initial estate of $13.2 million misses the point that the substituted-judgment decision is to be based not on what the conservatee *could* do but on what a reasonably prudent person in the conservatee's place *would* do. The superior court should have been given full information.

Because it was not, and because the omission was significant to its decision, the decision, and the order which embodies it, are fatally flawed.

Keresey does not seek outright reversal, or a remand for further hearing and consideration in the superior court. Instead he asks that this court in effect correct the superior court's "estate plan" to conform to Hart's probable wishes and to what Keresey considers sound estate-planning principles.

We cannot acquiesce in the proposal that we simply modify the substituted-judgment order and affirm the order as modified. Unless discretion could have been exercised in only one way we cannot undertake to exercise it in the superior court's stead. Even with consideration of the new evidence, it is apparent that more than one rational decision is possible in this matter. Indeed it is conceivable that the proposal the superior court initially approved may ultimately be approved again. But a decision can be made only after the superior court has been fully informed of all relevant circumstances. We shall remand the cause for further proceedings.

We emphasize that we do not hold that any omission to inform a superior court called upon to exercise substituted judgment will, when disclosed, invariably require reconsideration: The circumstances and significance of the nondisclosure must be assessed case by case.

ii. *The Section 2751 Order*

 Wells Fargo Bank has suggested that any disposition we might make of Keresey's appeal from the substituted-judgment order would be moot as to gifts authorized by the subsequent section 2751 order. The gifts, totalling $740,000, were made shortly after that order was entered. Subdivision (b) of section 2751 in pertinent part empowers a superior court in its discretion to direct a conservator to exercise powers notwithstanding an automatic stay effected, under subdivision (a) of the section, by an appeal from an earlier order. Subdivision (b) of section 2751 provides among other things that the acts of a conservator pursuant to a court's order under the subdivision "are valid, irrespective of the result of the appeal" from the earlier order.

 Subdivision (b) of section 2751 permits such an order only "for the purpose of preventing injury or loss to person or property." At least in part because one manifest effect of such an order is to abrogate, at least as a practical matter, an appellant's statutory right to review of the earlier order, exercise of the power granted by subdivision (b) must be clearly justified by a showing of risk of imminent injury or loss. (Cf. *Gold* v. *Superior Court* (1970) 3 Cal.3d 275, 281-282 [90 Cal.Rptr. 161, 475 P.2d 193].)

Characteristically the requisite degree of risk will appear from allegations of threatened imposition upon an incompetent conservatee, or threatened waste or dissipation of his or her estate. The situation before us is quite different: The Bank proposed, consistent in a general way with well-accepted estate planning techniques, overtly to diminish Hart's conservatorship estate for the financial benefit of her donees and, ultimately, of her devisees. The essence of the Bank's argument to bring its second petition within the terms of subdivision (b) of section 2751 was that the court should act promptly, in light of a possibility of a change in the circumstances of the conservatee or of her estate, or in the applicable tax laws, to obtain the projected benefits of the proposed gifts. Thus, the Bank's second petition depended entirely on the premise that a reasonably prudent person in Hart's position would *make* the gifts. In the special circumstances of this matter, the considerations underlying the section 2751 order cannot be severed from those fundamental to the substituted-judgment order.

We conclude that in the special circumstances of this matter it was essential that the court be as fully informed with respect to the section 2751 petition as it needed to be in order to substitute its judgment for the conservatee's in the first instance.

We wish to make clear that we state only a rule for the special case of an appeal from an order under the substituted-judgment statute, and, further, that *where the court has been fully informed* a substituted-judgment action may be authorized, in the court's sound discretion under subdivision (b) of section 2751, notwithstanding an appeal from the earlier substituted judgment order. Because in this case the superior court remained significantly misinformed, the section 2751 order must be reversed.

### 4. *Remaining Contentions*

We shall comment on the parties' remaining contentions for the guidance of the court and counsel on remand.

#### a. *Procedural Issues*

The substituted-judgment statute requires specified notice, and that the superior court make specified determinations and "take into consideration all the relevant circumstances." (Prob. Code, §§ 2581-2583.) The obvious thrust of these requirements is that the court give all interested parties a full and fair hearing.

#### i. *Unborn Issue*

Keresey argues that because the substantial proposed gifts would reduce the amount which might one day pass to unborn "issue" provided

for in Hart's will, the superior court should have appointed a guardian ad litem to represent the unborn issue in the superior court proceedings. Keresey further contends that the threatened "invasion of rights of the unascertained beneficiaries" could not be ordered without a showing that they would be benefitted by the invasion.

We find the argument unpersuasive. So long as Hart lives the interests under her will of anyone named or designated therein, born or unborn, are no more than expectancies. The cases on which Keresey relies, involving the duties of guardians ad litem actually appointed to represent interests of designated but unborn beneficiaries of existing trusts, are distinguishable. (*Leonardini* v. *Wells Fargo Bank* (1955) 131 Cal.App.2d 9, 18 [280 P.2d 81, 49 A.L.R.2d 1085]; *Wogman* v. *Wells Fargo Bank* (1954) 123 Cal.App.2d 657, 660, 665-667 [267 P.2d 423].)

Keresey argues that unborn issue should be deemed members of the class of beneficiaries under Hart's will to whom the Bank should have given notice under Probate Code section 2581. We are unwilling to construe section 2581 to mean more than it says, which is that notice is to be given to *beneficiaries*, implying persons in being and capable of receiving notice as distinct from unborn *potential* beneficiaries.

Finally, Keresey argues on the basis of *Conservatorship of Romo* (1987) 190 Cal.App.3d 279, 284-285 [235 Cal.Rptr. 377], that "[b]ecause the conservator cannot 'make a Will' for the conservatee, . . . it is logical that the factors to be considered under section 2580 are designed to insure that the conservator is not able, by means of a Petition, to effectuate a materially altered devolution of the conservatee's property." We are unpersuaded. *Romo* involved an attempt, by a conservator, literally to write a will for the conservatee; the Court of Appeal narrowly held that the substituted-judgment statute does not authorize such an action. ■ Absent an independent obligation to make a particular testamentary disposition (cf., e.g., *Estate of Watson* (1986) 177 Cal.App.3d 569, 573 [223 Cal.Rptr. 14]; Prob. Code, § 150), a donor is essentially free, during his or her lifetime, to give his or her entire estate to third persons and thus to frustrate the expectancies of persons named in his or her will. *Romo* does not reach such a situation and gives no basis for a conclusion that the rule would be different in a substituted-judgment situation.

■ In short, although the superior court has discretion to require more notice rather than less and, under Code of Civil Procedure section 373.5, to appoint guardians ad litem, we find no requirement that the court take special measures, in substituted-judgment proceedings, to protect unborn issue referred to only in the conservatee's will.

### ii. *Asserted Refusal to Hear Testimony*

 Keresey argues that the superior court, by "cutting the hearing short and refusing to hear any testimony," denied him the opportunity to obtain key testimony from his certified public accountant and thus deprived him of due process.

The contention is not supported by the record, which reflects that Keresey's attorney acquiesced in the court's suggestion that everything the accountant would say was already before the court in the form of documents and offers of proof the court was prepared to accept in lieu of evidence.

We should stress for purposes of remand, however, that adequate regard for the significance of substituted-judgment proceedings and for the rights of all parties including the conservatee requires that the superior court receive and consider relevant and otherwise admissible evidence.

Keresey also contends that the superior court improperly disregarded such of the accountant's opinions as were placed before the court, citing *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 313 [136 Cal.Rptr. 603], for his assertion that "the testimony of an uncontradicted expert may not be disregarded." Keresey's assertion is taken out of context and is far too broad for the circumstances of this matter. But in any event we would expect, on remand, that any tax experts with relevant insights will be permitted to testify.

### iii. *Burdens*

 Keresey argues that the superior court, rather than requiring the Bank to demonstrate that its plan "was created in accordance with the letter and spirit of section 2583," improperly placed the burden on Keresey to propose a better plan. In Keresey's view the superior court improperly presumed the Bank's proposal must be proper unless shown to be inadequate.

We agree with Keresey's premise that a substituted-judgment petitioner's proposal should not be authorized simply because no one has come up with a better idea. Even if wholly unopposed, the petition should be granted only if the court is satisfied, by a competent showing of all relevant circumstances, that in the last analysis the proposed action is what a reasonably prudent person in the conservatee's position would have done. If this criterion is not met, the court need not authorize any action.

#### iv. *Other Procedural Contentions*

Keresey also complains that certain points raised in his papers were "wholly ignored," that the Bank's reference in rebuttal to the federal generation-skipping transfer tax (26 U.S.C. §§ 2601-2663) improperly interjected "a newly raised point of law in a very complex area, raised orally, without any citations, references or briefing," and that the superior court made "odd comments," indicative to Keresey of "either his misreading of the petition or his failure to grasp the relevant estate planning concepts." None of Keresey's points is borne out by the record, but we would encourage the superior court, on remand, to proceed methodically, to consider and to permit comment on all well-conceived contentions, and to make a comprehensive and coherent record for any possible appellate review.

### b. *Exercise of Discretion*

Keresey contends in essence that on the evidence of record, considered in light of Probate Code section 2583's (hereafter section 2583) nonexclusive enumeration of "relevant circumstances," the superior court's decision was an abuse of discretion.

Section 2583 requires that the court "take into consideration all the relevant circumstances." The section's enumeration itself suggests that the Legislature did not anticipate the court would find every enumerated circumstance in every case. Nor does section 2583 explicitly require that every circumstance the court does find and consider be consistent with the action the conservator proposes, although of course the higher the degree of consistency the more readily the superior court may conclude the proposed action should be authorized. Nor does section 2583 require that the superior court make express findings as to the circumstances it considers, although such findings would be of substantial assistance to a reviewing court.

#### i. *Subdivision (a): Legal Capacity*

Subdivision (a) of section 2583 requires consideration of "[w]hether the conservatee has legal capacity for the proposed transaction and, if not, the probability of the conservatee's recovery of legal capacity." This subdivision implements the requirement that the court determine the conservatee either is not opposed to the proposed action or, if opposed, lacks legal capacity for the proposed action. (Prob. Code, § 2582, subd. (a).) Keresey does not challenge the Bank's representation that Hart lacked necessary legal capacity and was not likely to recover it.

### ii. *Subdivisions (b), (c): Past Donative Practices and Traits*

Subdivisions (b) and (c) of section 2583 require consideration of "[t]he past donative declarations, practices, and conduct of the conservatee" and "[t]he traits of the conservatee."

The Bank's only relevant showing was the petition's declaration that "[p]etitioner is informed and believes and thereon alleges that the making of these proposed gifts is consistent with the Conservatee's past donative declarations, practices and conduct." Strictly speaking, this conclusionary statement, made on information and belief, should not be regarded as evidence at all. (Cf. *Star Motor Imports, Inc.* v. *Superior Court* (1979) 88 Cal.App.3d 201, 204-205 [151 Cal.Rptr. 721].)

The Bank may have intended its petition to be no more than a pleading, submitted as a predicate for further proceedings once factual issue has been joined. As a practical matter an uncontested petition will often be made the basis for a court's order not because it contains competent evidence but simply because it is uncontested; if the petition is contested the petitioner will normally be expected to proceed with evidence sufficient to sustain the applicable burden. In our view a superior court in substituted-judgment proceedings should be reluctant to grant this kind of petition by default. Better practice would be to require proof, by declaration or otherwise, of all relevant circumstances, even if the petition is unopposed.

In this case Keresey's own paperwork, which the court was of course free to consider, and representations apparently acquiesced in by all parties at hearing, made clear that Hart had in the past made gifts, albeit in trust, at least to her three adopted daughters and to her grandchildren. One grandchild characterized the trusts for grandchildren as "very generous." Thus the superior court was informed of Hart's past donative practices. On remand the Bank may wish to produce such additional evidence as may be available.

### iii. *Subdivision (d): Relationships With Donees*

Subdivision (d) of section 2583 requires consideration of "[t]he relationship and intimacy of the prospective donees with the conservatee, their standards of living, and the extent to which they would be natural objects of the conservatee's bounty by any objective test based on such relationship, intimacy, and standards of living."

Keresey does not question the superior court's implicit conclusion that each of the donees would have been "natural objects" of Hart's bounty. Nor

does he directly complain of the superior court's failure to require some proof of the donees' standards of living or of other circumstances relevant to the propriety, from the standpoint of a reasonable person, of moving assets from Hart's estate to theirs.

### iv. *Subdivision (e): Conservatee's Wishes*

Subdivision (e) of section 2583 requires consideration of "[t]he wishes of the conservatee."

 Keresey asserts that the undisputed facts indicate the proposed action was inconsistent with Hart's wishes.

It is apparent, and Keresey concedes, that Hart could not competently state her wishes at the time of the proceedings below. Keresey relies on information concerning Hart's will and her previous inter vivos giving as circumstantial evidence that Hart would have "wished her adopted daughters to have no outright entitlement to her estate, and wished her grandchildren's specific bequests to be restricted [to $25,000 each]." Keresey asserts that the proposal to omit the potentially disinherited eighth grandchild from the proposed action, apparently in light of the provisions of Hart's will, is an isolated and thus inconsistent instance of respect for Hart's inferable wishes, insufficient to establish that the superior court had given sufficient consideration to those wishes.

We construe subdivision (e) more narrowly. Other subdivisions of section 2583 (including subdivisions (f) and (g), which refer directly and indirectly to any will the conservatee may have prepared) specifically enumerate various forms of circumstantial evidence of what the conservatee's wishes might have been had he or she been able to form and to express them. Subdivision (e) provides, narrowly, for a situation in which the conservatee can and does express his or her wishes.

### v. *Subdivisions (f), (g): Estate Plan and Devolution on Death*

 Subdivisions (f) and (g) of section 2583 require consideration of "[a]ny known estate plan of the conservatee (including, but not limited to, the conservatee's will, any trust of which the conservatee is the settlor, [and various other estate-planning devices not involved here])" and "[t]he manner in which the estate would devolve upon the conservatee's death, giving consideration to the age and the mental and physical condition of the conservatee, the prospective legatees, devisees, or heirs of the conservatee, and the prospective donees."

Keresey reiterates that the Bank's proposed action is not wholly consistent with Hart's will. We assume the parties will submit Hart's will to the superior court in proceedings on remand, but in any event we find in the statute no requirement that a proposal approved under the substituted-judgment statute be wholly consistent with the conservatee's will or estate plan: The will and estate plan, while usually important to the court's consideration, are simply two of several circumstances potentially relevant to the court's decision. We cannot unqualifiedly agree with Keresey's suggestion that "the single most important issue to be addressed . . . is whether the plan respected Mrs. Hart's own plans and desires."

Somewhat more plausibly, Keresey argues that "[t]he more it is necessary to damage or alter the existing estate plan, the greater the financial benefit which the conservator must show to be possible." This might indeed be an appropriate mode of analysis in given circumstances, but it is by no means the only permissible approach.

### vi. *Subdivision (h): Value, Liquidity, Productiveness of Estate*

Subdivision (h) of section 2583 requires consideration of "[t]he value, liquidity, and productiveness of the estate." The Bank provided sketchy information to the effect that Hart's estate was quite large and reasonably liquid and productive. Keresey does not complain of the sufficiency of this information.

### vii. *Subdivision (i): Minimization of Taxes and Expenses*

Subdivision (i) of section 2583 requires consideration of "[t]he minimization of current or prospective income, estate, inheritance, or other taxes or expenses of administration."

Surely, the superior court did consider tax and expense consequences, which were the primary focus of the Bank's petition and of colloquy at the hearing. Keresey nevertheless argues the point at some length, asserting that the Bank made an insufficient showing that its plan would achieve favorable tax consequences, that specified elements of the Bank's plan would not in fact achieve the desired consequences, and that the superior court obviously did not give sufficient consideration to various alternative approaches proposed by Keresey with the assistance of his accountant. He asserts the allegations of the Bank's petition "were unsupported by any specific facts" and were in some respects "inherently improbable." With specific reference to the generation-skipping transfer tax, Keresey argues the Bank's summary was erroneous and that the superior court relied on the erroneous summary and thus applied incorrect law.

It is apparent to us that in an estate the size of Hart's, and given the size of the gifts proposed, these considerations would have been of great importance in these proceedings. Obviously it would be at least equally important that the information furnished to the court on taxes and expenses be complete and accurate. We are concerned that neither the Bank nor Keresey may have met this standard. It will be essential, on remand, that all represented parties be prepared to assist the superior court with cogent analysis and carefully prepared pro forma calculations. We perceive in particular that the federal generation-skipping transfer tax statute, a marvelously complex provision, may be directly relevant to the question whether a reasonably prudent person in Hart's position would have given $120,000 to each of the adopted daughters outright or (as Keresey apparently suggests) by means of an ascertainable-standard lifetime income trust with a remainder to Hart's issue in second and subsequent generations.

Again we would stress that no single circumstance, whether or not enumerated in section 2583, should necessarily control the superior court's substituted-judgment decision. But tax and estate-planning considerations are obviously of particular importance in this matter.

viii. *Subdivision (j): Changes in Tax Laws*

Subdivision (j) of section 2583 requires consideration of "[c]hanges of tax laws and other laws which would likely have motivated the conservatee to alter the conservatee's estate plan."

Keresey shifts his approach with respect to this subdivision, arguing that the evidence shows Hart had not previously been influenced by tax considerations but instead "was primarily concerned with non-tax types of issues" and "made decisions based entirely upon non-tax considerations . . . ." Keresey's position appears to be, in essence, that subdivision (j) of section 2583 is irrelevant to this matter.

In our view subdivision (j) of section 2583, by its use of the words "would likely have motivated," again makes clear that the issue to be resolved is what a reasonably prudent person in the conservatee's position would do now. Keresey's approach improperly discounts the possibility that such a person would respond to sound advice as to how he or she should modify his or her previous practices and his or her estate plan in light of changes in applicable laws.

ix. *Subdivision (k): What a Prudent Person Would Have Done*

Subdivision (k) of section 2583 requires consideration of "[t]he likelihood from all the circumstances that the conservatee as a reasonably prudent person would take the proposed action if the conservatee had the capacity to do so."

██ Keresey asks us to view this subdivision as a directive to consider what Hart would do, and argues that the record does not provide direct evidence that Hart would have done what the Bank proposed and the superior court authorized.

We view the subdivision, instead, as a recapitulation of section 2583 as a whole, and as a reaffirmation of the principle that the question in substituted-judgment proceedings is not what the conservatee would do but rather what a reasonably prudent person in the conservatee's position would do. Keresey's assertion that Hart would not have made the gifts in the size, form, and manner proposed tends to disregard both the reality that no one can declare with absolute certainty what Hart would have done at this time, and the legislative admonition that the test focuses not necessarily on what Hart might have done several years ago but rather on what Hart as a reasonably prudent person (and thus, one concludes, with sound advice appropriate to her personal and financial circumstances) would do now.

Again, there is no indication in the record that the superior court did not synthesize and consider all circumstances made known to it.

*Disposition*

Our determination that the substituted-judgment order must be reversed creates a practical dilemma. On the one hand, even with consideration of the new evidence it is apparent there is room for more than one conclusion within the scope of the superior court's sound discretion; we cannot presume to exercise a discretion vested in the superior court but must remand the matter for further proceedings. On the other hand, upon the authority of the Probate Code section 2751 order there have been substantial changes in the positions of the parties: The gifts were made at the end of 1989 and early in 1990, more than a year ago, the gift taxes have been incurred and at least partially reported and paid, and presumably the donees have applied the gift proceeds in various ways and would encounter serious inconvenience were they required on short notice to make restitution to the conservatorship estate.

To resolve the dilemma we shall reverse the orders and remand for further proceedings with directions that the gifts shall not be rescinded, or restitution required, unless and until the superior court, on the basis of the further proceedings, shall determine that the gifts should not have been made. In necessary effect the superior court will be called upon to evaluate the gifts retrospectively, as it might in proceedings to confirm prior acts of a conservator under Probate Code section 2403, and for this purpose it may take into account any new information developed since the 1989 hearings,

but it shall nevertheless apply the provisions and standards of the substituted-judgment statute.

Because we cannot know, at this stage, whether there will be another substituted-judgment order, or (if so) whether there will be another appeal, and thus whether there will be any occasion for another application under Probate Code section 2751, it would be premature to direct further proceedings on the Probate Code section 2751 order and we shall not do so.

For reasons stated above the motions pending before the court are disposed of as follows: The motion of Wells Fargo Bank for consideration of evidence that appellant John McPike Keresey had received and retained the gift authorized for him by the orders appealed from is granted. The motion of appellant Keresey for consideration of evidence of the will of the conservatee and of the deposition of Patricia Black is denied. The motion of appellant Keresey for consideration of evidence of a 1989 federal gift tax return, and of an accounting, both filed by Wells Fargo Bank as conservator of the estate, is granted.

The order filed November 30, 1989, under Probate Code section 2751, subdivision (b), in Santa Clara County Superior Court action No. 109304, Conservatorship of Marcia Farrell Hart, is reversed with directions to deny the petition filed October 17, 1989.

The order filed August 28, 1989, in the same superior court proceedings, authorizing specified gifts under Probate Code section 2580 and following sections, is reversed and the cause is remanded to the superior court for further proceedings, consistent with the views expressed in this opinion, on the petition filed June 27, 1989, as the petition may hereafter be amended by leave of the superior court. In further proceedings all parties shall be given leave to present additional oral and documentary evidence and argument, to the end that the superior court shall be fully and fairly informed of all relevant circumstances.

Gifts heretofore made under the orders of August 28, 1989, and November 30, 1989, hereinabove referred to, shall not be deemed rescinded for any purpose, and no restitution of the amount of any such gift shall be required, unless and until the superior court, upon the completion of the further proceedings hereinabove directed, shall so order.

The parties shall bear their own costs on appeal.

Capaccioli, Acting P. J., and Elia, J., concurred.