[No. H026400. Sixth Dist. Dec. 7, 2004.]

Conservatorship of the Person and Estate of KATHRYN McDOWELL.
ROBERT CECIL, Acting Public Guardian, as Conservator, etc., Petitioner
and Respondent, v.
ANN NETCHARU, Objector and Appellant.

## COUNSEL

Ann Miller Ravel, County Counsel, and Kathryn J. Zoglin, Deputy County Counsel, for Petitioner and Respondent.

Kai H. Wessels for Objector and Appellant.

## OPINION

**RUSHING, P. J.—**

### STATEMENT OF THE CASE

Petitioner and respondent Santa Clara County Public Guardian Robert Cecil, conservator for Kathryn McDowell, filed a petition for substituted-judgment (Prob. Code, § 2580 et seq.),[1] requesting authority to revoke Ms. McDowell's existing will and execute a trust and a new will with a different beneficiary. The court granted the petition. Objector and appellant Poonsri Ann Netcharu, who was a beneficiary under the existing will, appeals from the order.

We reverse the order and remand for reconsideration.

### BACKGROUND

Petitioner was appointed temporary conservator for Ms. McDowell on August 31, 2000, and permanent conservator on January 25, 2001. He filed the petition on March 11, 2002. In seeking permission to execute a new will and trust, petitioner alleged that Ms. McDowell's existing will, executed on September 13, 2000, was invalid because Ms. McDowell lacked testamentary capacity at the time and because the will was the product of undue influence that the two named beneficiaries exerted over Ms. McDowell. He sought to name Guide Dogs for the Blind as the sole beneficiary under the new documents.

---

[1] All further statutory references are to the Probate Code unless otherwise specified.

In support of the petition, petitioner alleged that in 1998, Ms. McDowell, an elderly retired woman, allowed Reza Fatipoor[2] and Parvis Talsocaiman to live with her in her house, and in exchange, they agreed to take care of her. In June 2000, Ms. McDowell was hospitalized for a hip fracture, and upon her release, hospital staff notified Adult Protective Services (APS) due to concerns about her care. Thereafter, Ms. McDowell's mental faculties started to decline. APS also became concerned about her care and suspected financial abuse by Fatipoor and Talsocaiman. As a result, it requested that the public guardian establish a conservatorship. In August 2000, the public guardian was appointed temporary conservator.

The petition further alleged that in September 2000, Fatipoor and his friend objector took Ms. McDowell to three different attorneys—Tom Bouman, James Arnold, and Meyer Sher—for the purpose of drafting various legal documents. Bouman declined to prepare a power of attorney due to concerns about Ms. McDowell's mental capacity. Attorney Arnold, who had done legal work for Ms. McDowell in the past, declined to prepare estate planning documents. However, Attorney Sher prepared the September 2000 will, which named Fatipoor and objector as executors and sole beneficiaries.

Last, the petition alleged that in October 2000, Ms. McDowell went to the emergency room because of pain. On November 16, 2000, Paul Heidenrich from the public guardian's office visited Ms. McDowell's home and found her semi-conscious. She was admitted to the hospital in an unresponsive physical state and the next day transferred to a skilled nursing facility. In January 2001, Doctor Gary Steinke, M.D., submitted a report, in which he opined that Ms. McDowell was suffering from "advanced dementia."

Objector objected to the petition. She denied that Ms. McDowell lacked testamentary capacity and also denied that she induced Ms. McDowell to name her a beneficiary by means of fraud, duress, menace, or undue influence. She asserted that they were friends, and she cared for and assisted Ms. McDowell.[3]

At a bench trial, petitioner presented evidence to show that Ms. McDowell was incompetent to make a will in September 2000. Petitioner also presented evidence to show that Fatipoor and objector harbored an evil intent and conspired to take advantage of Ms. McDowell, obtain control of her assets, and induce her to name them as beneficiaries. Then, after Ms. McDowell

---

[2] We adopt this spelling of Fatipoor's name, although it is spelled differently in other parts of the record.

[3] Apparently Fatipoor also objected to the petition. However, he did not appear, and his objection was ultimately dismissed and a default entered for failure to comply with an order compelling his deposition.

executed the will, Fatipoor and objector mistreated and neglected Ms. McDowell, whose condition deteriorated significantly. Prior to and at trial, petitioner further argued that under section 21350, Fatipoor and objector were statutorily disqualified from receiving under the September 2000 will because they were Ms. McDowell's "care custodian[s]" and are presumed to have exerted undue influence.[4]

After trial, the court overruled objector's objection and entered an order granting the petition. The court rejected petitioner's claim that Ms. McDowell lacked the testamentary capacity in September 2000. The court found no evidence that objector was evil or that she used duress, menace, or fraud to induce Ms. McDowell to execute the will. However, the court found that objector was a "care custodian" and had failed to rebut the presumption of undue influence. Accordingly, the court found that Ms. McDowell's will was ineffective as to objector. The court then turned to the question of who should be the beneficiaries under a new will and trust. The court was not convinced that Ms. McDowell would want to leave her entire estate to Guide Dogs for the Blind. Based on her expressions of interest in that organization and her acts of generosity toward the homeless throughout her life, the court authorized petitioner to distribute Ms. McDowell's estate in equal shares to Guide Dogs for the Blind, Inn Vision, and the Emergency Housing Consortium. The court considered but declined to reinclude objector as a beneficiary. Although the court accepted evidence and a stipulation that as of January 2001, Ms. McDowell lacked capacity to make a will, it accepted the testimony of Ms. McDowell's former attorney, Peter Stern, who related conversations he had had with Ms. McDowell in spring 2001, in which she indicated that she did not want to leave her estate to the people named in her will.

## OBJECTOR'S CONTENTIONS ON APPEAL

Objector claims that the order granting the petition must be reversed because the petition failed to allege that she was a "care custodian" and as such a disqualified beneficiary. On the merits, objector claims the court erred in finding that she was a "care custodian" and that she failed to rebut the presumption of undue influence. She claims the record establishes a lack of

---

[4] Section 21350 provides, in relevant part, "(a) . . . [N]o provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following: [¶] . . . [¶] (6) A care custodian of a dependant adult *who is the transferor*." (Italics added.)

Under section 21351, subdivision (d) a "care custodian" is not disqualified if "[t]he court determines, upon clear and convincing evidence, but not based solely upon the testimony of [the care custodian], that the transfer was not the product of fraud, menace, duress, or undue influence." (See *Estate of Shinkle* (2002) 97 Cal.App.4th 990, 1007–1008 [119 Cal.Rptr.2d 42] (*Shinkle*) [burden on "care custodian" to rebut presumption of undue influence].)

undue influence as a matter of law. Last, objector claims the court erred in excluding her as a beneficiary under the new will and trust.[5]

## THE DEFECTIVE PETITION

Objector contends that because the petition failed to allege that she was disqualified as a "care custodian" under section 21350 or even mention the applicable statutes, the petition failed to provide adequate notice that disqualification was an issue and failed to properly place that issue before the court. Thus, she claims the court could not properly rely on that theory, and its order must be reversed.

The petition is silent concerning the disqualification theory under section 21350. However, we note that petitioner raised and devoted most of his trial brief to the issue. There, petitioner reiterated his accusation that Fatipoor and objector had mistreated and taken advantage of Ms. McDowell. He further noted that in ruling on the petition, the court must consider all relevant circumstances, and a beneficiary's disqualification as a "care custodian" is a relevant consideration. In particular, petitioner asserted generally that "[r]evocation of the [previous] will is in the conservatee's best interest, given her lack of legal capacity at the time that [the] Will was executed and the likelihood that the Will was procured by undue influence and as a result of elder financial abuse." Petitioner more specifically argued that a new estate plan was appropriate because Fatipoor and objector were disqualified under section 21350 and could not rebut the presumption of undue influence. In other words, a new will was necessary because the existing will would fail for lack of qualified beneficiaries.

Before trial, objector moved to exclude evidence on the "care custodian" disqualification issue. In opposition, petitioner reiterated that under the substituted-judgment statute, the court should consider all relevant circumstances, including whether the beneficiaries under the existing will are disqualified. In denying objector's motion, the court stated, "I'm looking at the original petition, and although it's not crystal clear exactly what theories the petitioner is going to proceed on, I think it's broad enough to cover this area because they are asking for revocation of the prior will based on particular code sections on the grounds of abuse and undue influence. I think that would cover it."

Notwithstanding the failure to allege disqualification in the petition, we find that objector had sufficient notice that petitioner intended to rely on that

---

[5] We note that Ms. McDowell died while this appeal was pending. The parties assert, and we agree, that her death does not abate the proceedings. (See, e.g., *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288 [63 Cal.Rptr.2d 74, 935 P.2d 781] [death of party while appeal pending does not abate proceedings].)

theory. We observe that after objector's motion was denied, she did not request that the petition be amended or seek a continuance to prepare evidence and a defense against the disqualification claim. Rather, she filed a supplemental trial brief, disputing the claim and offering evidence and argument to show that she was not a care custodian. Under the circumstances, we decline to reverse the order based solely on the allegedly defective petition. Simply put, we do not find that petitioner's failure to include allegations in the petition was prejudicial. This is especially so because, as we discuss below, the care custodian issue involves application of the law to essentially undisputed facts.

We now turn to objector's main substantive challenge to the court's order.

### APPLICABLE PRINCIPLES AND STANDARD OF REVIEW

■ Under sections 2580 through 2586, a superior court may, upon the petition of any interested person and after consideration of all relevant circumstances, exercise its discretion to authorize or require a conservator to take a variety of different actions affecting the conservatee's estate.[6] "In essence the statute permits the court to substitute its judgment for that of a conservatee." (*Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1250 [279 Cal.Rptr. 249] (*Hart*); see *Estate of Christiansen* (1967) 248 Cal.App.2d 398 [56 Cal.Rptr. 505] [discussing the common law doctrine of substituted judgment, later codified in § 2580 et seq.].) "[T]he question in substituted-judgment proceedings is not what the conservatee would do but rather what a reasonably prudent person in the conservatee's position would do." (*Hart, supra,* 228 Cal.App.3d at p. 1270.) ■ We review the trial court's order granting substituted judgment for abuse of discretion. (*Id.* at pp. 1253–1254.)

### THE COURT'S FINDING THAT OBJECTOR WAS DISQUALIFIED AS A CARE CUSTODIAN

Objector contends the court erred in finding that she was a care custodian and thus presumptively disqualified as a beneficiary under Ms. McDowell's existing will.

---

[6] Section 2580 provides, in relevant part, "(a) The conservator . . . may file a petition under this article for an order of the court authorizing . . . the conservator to take a proposed action for any one or more of the following purposes: [¶] (1) Benefiting the conservatee or the estate. [¶] (2) Minimizing current or prospective taxes or expenses of administration of the conservatorship estate or of the estate upon the death of the conservatee. [¶] (3) Providing gifts for any purpose, and to any charities . . . as would be likely beneficiaries of gifts from the conservatee. [¶] (b) The action proposed in the petition may include, but is not limited to, the following: [¶] (1) Making gifts of principal or income, or both, of the estate, outright or in trust. [¶] . . . [¶] (5) Creating for the benefit of the conservatee or others, revocable or irrevocable trusts of the property of the estate, which trusts may extend beyond the conservatee's disability or life. [¶] . . . [¶] (13) Making a will."

I. *Waiver*

Petitioner claims that the "care custodian" issue is not cognizable in this appeal because objector did not appeal from the right order. He notes that she appealed from the order granting the petition filed on July 2, 2003. According to petitioner, however, the "care custodian" issue was resolved in a separate judgment entered on March 4, 2004. Thus, because objector did not appeal from that judgment, she, in effect, waived her claim.

On July 2, 2003, the court filed an order granting the petition and authorizing petitioner to revoke the existing will and execute a new will and trust with three beneficiaries. On July 3, 2003, objector filed a request for a statement of decision. (Code. Civ. Proc., § 632.) On September 2, 2003, objector filed a notice of appeal. Later, on December 12, 2003, the court issued its statement of decision.[7] Among other things, the court explained the factual basis for finding that objector was a "care custodian." Under the circumstances, we conclude that objector's claim concerning the court's finding is cognizable in this appeal because that finding is encompassed in the order filed on July 2, 2003.

Conversely, we do not find that the court resolved the "care custodian" issue in a separate order filed on March 3, 2004. That document, which was prepared by petitioner, is denominated "Judgment After Bench Trial." It does not refer to the court's previous order granting the petition or to objector's currently pending appeal. It grants petitioner's petition; vacates and sets aside the "purported Will of the Conservatee dated January 4, 2001"; and awards costs to petitioner.

■ Simply put, we do not know quite what to make of this document. It purports to grant a petition that had already been granted in an order that petitioner concedes was appealable and that was already the subject of a pending appeal. Ordinarily, a notice of appeal divests the trial court of jurisdiction, at least insofar as the subject and merits of the order are concerned. (See *Takahashi v. Fish & Game Com.* (1947) 30 Cal.2d 719, 725 [185 P.2d 805], revd. on other grounds in *Torao Takahashi v. Fish and Game Commission* (1948) 334 U.S. 410 [92 L.Ed. 1478, 68 S.Ct. 1138] ["An appeal removes . . . the jurisdiction of the trial court [over] the subject matter of the judgment or order appealed from, including all issues going to the validity or correctness of such judgment or order"]; see also 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 22, pp. 82–83 and cases cited there.) Second, this

---

[7] The document is denominated an "Order," but it states, "The court, having considered the evidence and heard arguments of counsel, issues the following *statement of decision*." (Italics added.) Moreover, petitioner later stipulated that the record on appeal was incomplete because it lacked "the statement of decision, entitled 'ORDER,' filed on December 12, 2003."

"Judgment" erroneously dates Ms. McDowell's existing will, then vacates and sets it aside, even though petitioner argued below that the proceedings were not a will contest and, more importantly, the original order authorized petitioner to revoke that will. Nevertheless, insofar as this "Judgment" represents an order awarding costs, it was separately appealable. (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46 [269 Cal.Rptr. 228].)

Even if we assume for purposes of argument that objector should have appealed from the "Judgment," rather than, or in addition to, the July 2, 2003 order, the procedural confusion from two separate orders granting the same petition would lead us to exercise our discretion and, in the interest of justice, deem objector's notice of appeal to have been from both the initial order and this subsequent "Judgment." (Cf. *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920–921 [167 Cal.Rptr. 831, 616 P.2d 813] [exercising discretion in similar fashion].)

## II. *The Factual Basis for the Court's Finding*

In its oral pronouncement and statement of decision, the court found that objector and Ms. McDowell became friends around February 2000, after Fatipoor introduced them. Objector visited Ms. McDowell and sometimes brought her coffee and food. In June 2000, Ms. McDowell was hospitalized for a broken hip. Objector did not visit her there, but after Ms. McDowell's release, she visited Ms. McDowell often and regularly brought meals. In this regard, the court made special note of the fact that after Ms. McDowell was hospitalized in November 2000, objector submitted a bill for the meals she had provided.[8]

The court further found that over time, objector "also started taking care of Ms. McDowell's personal needs, i.e.[,] bathing, hygiene, etc. The testimony on exactly what was done and when it was accomplished is not crystal clear. There is some variance in the deposition and trial testimony of Ms. Netcharu. At certain times, the extensive care of Ms. McDowell's personal care appears to have begun during the summer months. At other times, Ms. Netcharu testified that the changing of diapers and bathing only commenced after the [September 2000] will was executed. The Court finds that Ms. Netcharu began taking care of the personal needs of Ms. McDowell during the summer of 2000."

---

[8] After a permanent conservatorship was established, the attorney appointed to represent Ms. McDowell, Peter Stern, told objector to submit any bills she had to the estate. Objector submitted the bill, but, as the court found, it was not paid. Objector was never reimbursed for any of the meals she provided.

The court found that when objector and Fatipoor brought Ms. McDowell to the attorney who drafted the will, a doctor friend of the attorney happened to be there. At the attorney's request, the doctor privately interviewed Ms. McDowell for 15 to 20 minutes to gauge her testamentary capacity. She told him she was dependent upon her two helpers for medical care, home maintenance, food and clothing. She said she was leaving her money to them because they were assisting her.

The court further found that "[d]uring the period of time after the will was written Ms. Netcharu was bathing, dressing and changing diapers of Ms. McDowell. Ms. McDowell's physical condition was deteriorating rapidly and Ms. Netcharu was attempting to get medical aid for Ms. McDowell. She also called the Public Guardian to alert them to her deteriorating condition but did not immediately hear from them. Ms. Netcharu on her own took Ms. McDowell to the doctor. Ms. Netcharu with the minor aid from Fathipour, was the principal individual concerned with Ms. McDowell's condition."

Given these findings, the court concluded that when Ms. McDowell executed the September 2000 will, she was a "dependent adult," and objector was a "care custodian" within the meaning of section 21350.[9] The court observed, "Ms. Netcharu was well meaning and did form a friendship with Ms. McDowell between February and August 2000, even though she was unable to visit her during her hospitalization in June. In essence, Ms. Netcharu knew Ms. McDowell for 5 or 6 months before she arrange[d] an appointment with [the first attorney]. The evidence demonstrated that during the 2000 summer months, Ms[.] Netcharu became Ms. [Mc]Dowell's care custodian albeit unsalaried by providing food and personal services."

### III. *The Definition of "Care Custodian"*

To evaluate the court's conclusion, we first discuss who qualifies as "care custodian." Section 21350, subdivision (a)(6) adopts the definition of "care custodian" in Welfare and Institutions Code section 15610.17. That statute provides, in relevant part, " 'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for

---

[9] Section 21350, subdivision (c) adopts the definition of a " 'Dependent adult' " in Welfare and Institutions Code section 15610.23, which defines " 'Dependent adult' " as "any person between the ages of 18 and 64 years, who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age." Section 21350, subdivision (c) extends this definition to persons who are "older than age 64."

Objector does not dispute the court's finding that Ms. McDowell was a dependent adult.

elders or dependent adults, including members of the support staff and maintenance staff: [¶] . . . [¶] (y) Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults."[10] (Welf. & Inst. Code, § 15610.17.)

Two cases have dealt with the meaning of "care custodian" and the validity of a donative transfer to a person who provided care for a dependent adult.

In *Shinkle, supra*, 97 Cal.App.4th 990, a volunteer long-term-care ombudsman named Thompson met Shinkle, an elderly woman, in the care facility where he worked. Over a three-year period, he helped her with her personal financial matters and learned about her assets. During this time, she told him a few times that she wanted to leave her estate to him. He replied that she would have to do something to make it happen. Ultimately, Thompson was transferred to a different facility and stopped being Shinkle's ombudsman. However, Shinkle asked him to visit, and he started doing so, even though it was inappropriate for an ombudsman to maintain contact with a former client.

---

[10] In full, the statute provides, " 'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff: [¶] (a) Twenty-four-hour health facilities, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code. [¶] (b) Clinics. [¶] (c) Home health agencies. [¶] (d) Agencies providing publicly funded in-home supportive services, nutrition services, or other home and community-based support services. [¶] (e) Adult day health care centers and adult day care. [¶] (f) Secondary schools that serve 18- to 22-year-old dependent adults and postsecondary educational institutions that serve dependent adults or elders. [¶] (g) Independent living centers. [¶] (h) Camps. [¶] (i) Alzheimer's Disease day care resource centers. [¶] (j) Community care facilities, as defined in Section 1502 of the Health and Safety Code, and residential care facilities for the elderly, as defined in Section 1569.2 of the Health and Safety Code. [¶] (k) Respite care facilities. [¶] (*l*) Foster homes. [¶] (m) Vocational rehabilitation facilities and work activity centers. [¶] (n) Designated area agencies on aging. [¶] (*o*) Regional centers for persons with developmental disabilities. [¶] (p) State Department of Social Services and State Department of Health Services licensing divisions. [¶] (q) County welfare departments. [¶] (r) Offices of patients' rights advocates and clients' rights advocates, including attorneys. [¶] (s) The office of the long-term care ombudsman. [¶] (t) Offices of public conservators, public guardians, and court investigators. [¶] (u) Any protection or advocacy agency or entity that is designated by the Governor to fulfill the requirements and assurances of the following: [¶] (1) The federal Developmental Disabilities Assistance and Bill of Rights Act of 2000, contained in Chapter 144 (commencing with Section 15001) of Title 42 of the United States Code, for protection and advocacy of the rights of persons with developmental disabilities. [¶] (2) The Protection and Advocacy for the Mentally Ill Individuals Act of 1986, as amended, contained in Chapter 114 (commencing with Section 10801) of Title 42 of the United States Code, for the protection and advocacy of the rights of persons with mental illness. [¶] (v) Humane societies and animal control agencies. [¶] (w) Fire departments. [¶] (x) Offices of environmental health and building code enforcement. [¶] (y) Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults." (Welf. & Inst. Code, § 15610.17.)

Some time later, Shinkle returned home. Thompson continued to see her there and help with financial matters. During this period, he told her it was okay to leave her estate to him because he was no longer her ombudsman. He arranged for a nonattorney estate planner to visit, and all three met together to discuss an estate plan. Thereafter, Shinkle signed trust documents that made Thompson the successor trustee, Thompson's wife an alternate successor trustee, and Thompson's children the trust beneficiaries if Thompson died before Shinkle. (*Id.* at. pp. 993, 995–1000.) After Shinkle died, the public administrator and a relative of Shinkle challenged the trust, claiming that Thompson was a "care custodian" and thus a disqualified beneficiary. The trial court agreed and voided the trust. (*Id.* at pp. 1000–1001, 1004.)

On appeal this court affirmed. We concluded that Thompson came within the statutory definition of "care custodian," which covers administrators, employees, and support and maintenance staff of public and private facilities and agencies, including " '[t]he office of the long-term care ombudsman.' " (*Shinkle, supra*, 97 Cal.App.4th at pp. 1005–1006, quoting Welf. & Inst. Code, § 15610.17, subd. (s).) We rejected Thompson's claim that he lost that status when he ceased being Shinkle's ombudsman and began to see her and help her simply as a friend. (*Shinkle, supra*, 97 Cal.App.4th at p. 1005.) We observed that but for the ombudsman's program and Thompson's position as Shinkle's ombudsman, he would not have met her or learned about her personal and financial circumstances or gained her trust. We further noted that their relationship of trust continued until Shinkle's death, and during that time Thompson remained a certified ombudsman. (*Id.* at p. 1006.) Under the circumstances, we held that although Thompson may have stopped being *Shinkle's* assigned ombudsman, his status as a "care custodian" continued until she died. (*Id.* at pp. 1006–1007.) We reasoned that if his status were allowed to change, then "an ombudsman could inherit from a former resident after that person was discharged from the facility, thereby circumventing the purpose of section 21350." (*Id.* at p. 1006.) Indeed, "individuals like Thompson could avoid the prohibitions of section 21350 merely by changing their assignments, changing jobs, or ceasing to provide volunteer services in order to benefit from a donative transfer from someone with whom they previously had a fiduciary relationship. Such a construction would be contrary to the purpose of section 21350, which is to prevent care custodians from taking advantage of their elderly charges and obtaining gifts through undue influence." (*Ibid.*) Moreover, we observed that there was no limiting language in the pertinent statutes that distinguished between "activity undertaken by ombudsmen in their role as ombudsmen and activities undertaken by ombudsmen, vis-à-vis the population they serve, on their own time or outside their role as ombudsmen. If we were to permit different rules to apply, depending upon whether an ombudsman was acting within or outside of his or her role as ombudsman, we would invite just the kind of abuse that occurred in this case." (*Id.* at p. 1007.) In this regard, we noted that "[b]oth

the program director and another volunteer ombudsman testified that Thompson's conduct in befriending Shinkle, paying her bills and doing her banking was inappropriate for an ombudsman. These were the very activities that allowed Thompson to gain Shinkle's trust and information about her financial affairs." (*Ibid.*)

In *Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035 [6 Cal.Rptr.3d 702] (*Davidson*), Dolores Davidson executed a will in 1996. It revoked her prior 1990 will, which left her estate to her cousin Morken, and instead left it to a man named Gungl, whom she and her husband had befriended in 1962. After Davidson's husband died, her relationship to Gungl and Gungl's partner Holtz strengthened, and Gungl became her primary provider of transportation. In 1992, Davidson was hospitalized, and after she returned home, her physical and mental condition deteriorated. Consequently, Gungl and Holtz assumed greater responsibility for her care, shopping and cooking for her and taking her wherever she needed to go. In 1993, Davidson executed a power of attorney for Gungl, and he assumed responsibility for her mail, bills, and banking. In 1995, Gungl had an estate planner talk to Davidson, and she said she wanted to leave everything to Gungl. The planner prepared various documents, and in 1996, Davidson executed a trust and new will. They named Gungl as successor trustee and sole beneficiary and made several specific gifts, including one to Morken. After Davidson died, Morken's husband challenged the trust, claiming, among other things, that Davidson lacked testamentary capacity in 1995, the trust was the product of Gungl's undue influence, and Gungl was a "care custodian" and thus a disqualified beneficiary. The trial court rejected all three claims. (*Id.* at pp. 1041–1043, 1045–1046.)

On appeal, Morken's husband claimed that Gungl's care and services rendered him a "care custodian" under the general provision of Welfare and Institutions Code section 15610.17, which refers to "*persons* providing care *or services* for elders or dependent adults," and under the more specific catchall category for "[a]ny other . . . *private* . . . *person* providing health services or social services to elders or dependent adults." (*Id.*, § 15610.17 & subd. (y), italics added; see *Davidson, supra,* 113 Cal.App.4th. at pp. 1048–1049.)

The appellate court rejected this claim. The court opined that that interpretation of the statutory language was overbroad because it would disqualify virtually any nonrelated individual who provides care to a dependent adult, no matter how intimately and personally connected they might be. The court further pointed out that the interpretation would cover not just the provision of health care or social services, "but such acts as simply cooking for an

elderly person, driving a house-bound individual to the bank or doctor, or going shopping for them." (*Davidson, supra,* 113 Cal.App.4th at p. 1049.) According to the court, this view "does violence not only to traditional principles of private charity and contemporary societal structures and relationships, but to the explicit language of the relevant statutes." (*Ibid.*) Noting the extensive list of public agencies and private professional organizations and individuals enumerated in Welfare and Institutions Code section 15610.17, the court observed that the statute focused on the occupational provision of health and social services and concluded that the assistance Gungl and Holtz offered—i.e., errands, chores, and household tasks such as cooking, gardening, driving, shopping, banking—"cannot be equated with the provision of 'health services and social services' specified by the subject statutes as constituting custodial care." (*Id.* at p. 1050.) Moreover, the court opined that "[t]he kind of personal, nonprofessional care provided by Gungl to Davidson may be brought within the scope of the subject statutes only by severely editing the statutory language." (*Id.* at pp. 1049–1050.)

In addition, the court found that Morken's husband's expansive interpretation was inconsistent with the legislative history of section 21350, which reflected a "legislative intent . . . to place limitations on the ability of *professional* 'care custodians' to receive donative transfers from elderly testators." (*Davidson, supra,* 113 Cal.App.4th at p. 1051, italics in original.) The court found that "[t]his intent is not advanced by imposing burdensome technical and procedural barriers on the ability of elderly individuals to recognize and reward services performed for them in their declining years by close personal friends, intimates and companions. It would be both tragic and ironic if the statute were interpreted so broadly as to result in effectively punishing such individuals for the self-sacrificing acts of care and companionship they provided to the aging." (*Ibid.*)

The court also discussed *Shinkle, supra,* 92 Cal.App.4th 990, and found it to be both distinguishable and instructive. (*Davidson, supra,* 113 Cal.App.4th at p. 1052.) It was distinguishable because, unlike Thompson's relationship with Shinkle, Gungl's relationship with Davidson did not arise from a preexisting professional and fiduciary relationship, such as being her ombudsman, a category expressly included in the statutory definition of "care custodians." Given *Shinkle,* the court held that "the statute bars donative transfers to individuals who have assumed the role of 'care custodian' to a dependent adult incidental to the professional or occupational provision of health or social services to that dependent adult, rather than in connection with a personal or familial relationship; and whose personal relationship, if any, with the dependent adult is entirely incidental, secondary to, and derived from the preexisting professional or occupational connection. By the same token, we hold that when an individual becomes what is in effect a care custodian of a dependent adult as a direct result of a preexisting genuinely

personal relationship rather than any professional or occupational connection with the provision of health or social services, that individual should *not* be barred by section 21350 from the benefit of donative transfers unless it can otherwise be shown that the subject transfer was the result of undue influence, fraud or duress." (*Id.* at pp. 1052–1053, italics in original.)

The court explained that "[t]he *controlling* question is whether the relationship between the caregiver and the dependent adult arose out of the provision of health or social services, or whether instead the provision of care developed naturally from a preexisting genuinely personal relationship. In making this determination, several factors are relevant and must be considered. These include (1) the length of time the individuals had a personal relationship before assuming the roles of caregiver and recipient; (2) the closeness and authenticity of the personal relationship; and (3) whether any money was paid for the provision of care. Each of these factors must be weighed in analyzing whether an individual is a 'care custodian' for purposes of section 21350, even if none by itself is ultimately controlling in making that determination." (*Davidson, supra,* 113 Cal.App.4th at p. 1054, italics added.)

Last, the court rejected Morken's husband's claim that Gungl became a professional or occupational caregiver because he received some compensation for his services.[11] (*Davidson, supra,* 113 Cal.App.4th at p. 1053.) However, the trial court found that the money paid to Gungl was for the direct benefit of Davidson herself and covered Gungl's own out-of-pocket expenses for her care. The appellate court found substantial evidence to support that finding. (*Id.* at pp. 1046, 1055.) Moreover, the court observed that there was no evidence Gungle had ever provided health or social services to anyone. Rather, he was a professional musician and "an individual helping out a very old and dear friend in her time of need." (*Id.* at p. 1055.)

Given *Davidson* and *Shinkle,* we conclude that the evidence here does not support the court's finding that objector was a "care custodian." Objector was not a professional or occupational caregiver, and there is no evidence she generally offered care services to the elderly and dependent adult population as a paid or volunteer provider. Nor is there evidence that objector's relationship with Ms. McDowell grew out of a preexisting professional or occupational connection or that objector and Ms. McDowell had a quid pro quo arrangement, under which Ms. McDowell reasonably expected objector to provide care, and objector reasonably expected something in return. Rather, the court found that objector was a well-meaning friend. The record

---

[11] The record revealed that after a conservator was appointed, Gungl was ordered to make an accounting of the checks he had written for Davidson, and several were written to him and Holtz or to cash and marked as payment for " 'salary' " or " 'wages.' " (*Davidson, supra,* 113 Cal.App.4th at pp. 1054–1055.)

reveals only that objector and Ms. McDowell met and became friends, objector visited Ms. McDowell and brought her food and coffee, and as Ms. McDowell's physical condition deteriorated, objector visited more regularly, brought meals, took her to the hospital, called the Public Guardian on her behalf, and provided more intimate personal care, like bathing her, washing her hair, and changing her diapers. In short, we can find no material basis to distinguish this case from *Davidson.*

Petitioner makes the same claim raised by Morken's huband in *Davidson:* Objector comes within the general definition of "care custodian" in Welfare and Institutions Code section 15610.17—i.e., individuals "providing care or services for elders or dependent adults"—and the catchall category—i.e., "Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults." (*Id.,* § 15610.17 & subd. (y).) The *Davidson* court rejected the identical claim, and so do we.

Petitioner acknowledges *Davidson* but urges us not to follow it. First, he distinguishes *Davidson* on the ground that objector's relationship with Ms. McDowell was short compared with that of Gungl and Davidson—i.e., months versus decades. The distinction is undeniable, but, in our view, it does not make a difference in determining whether objector was a "care custodian." Although the *Davidson* court emphasized the length of Gungl's relationship with Davidson, it did not invest it with controlling importance or set a minimum duration for a friendship. Rather, the court noted the closeness and authenticity of the relationship and focused on whether the giving of care was incidental to a personal relationship or an outgrowth of some preexisting professional or occupational connection. As noted, Ms. McDowell did not invite or engage objector to provide any care. Nor did they have some preexisting arrangement or understanding, whereby Ms. McDowell expected objector to provide care. Rather, the relationship began as a friendship, and objector provided some companionship, care, and assistance arising from that friendship. Certainly, evidence that objector and Ms. McDowell were old friends might make the circumstances here as compelling as those in *Davidson.* However, the relative brevity of the relationship does not, in our view, render *Davidson* inapposite.

■ Petitioner also distinguishes *Davidson* on grounds that (1) Ms. McDowell was under a temporary conservatorship when she made objector a beneficiary, (2) the public guardian questioned the authenticity of objector's relationship, and (3) objector submitted a bill for the meals she provided Ms. McDowell. Petitioner does not explain, and we fail to grasp, the relevance of Ms. McDowell's temporary conservatorship in determining whether objector was a care custodian. And although the Public Guardian argued, in

essence, that objector pursued a devious plan to gain Ms. McDowell's assets, the court found no evidence of evil motivation, characterizing objector as simply a well-meaning friend. Finally, the bill objector submitted is irrelevant. As noted, there is no evidence that objector and Ms. McDowell had a financial agreement concerning meals, Ms. McDowell's attorney told her to submit bills for any expenses, and the food bill was not paid. (See *ante*, fn. 8.) Moreover, *Davidson* makes clear that the reimbursement for expenses incurred in caring for a dependent adult does not necessarily or automatically transform a friend into a care custodian.

Next, petitioner claims *Davidson*'s analysis is flawed because the court failed to consider 1998 amendments to Welfare and Institutions Code section 15610.17, which, according to petitioner, "deliberately expanded the category of care custodians beyond paid professionals" "to include any person that provides health or social services to elders," including objector. A careful review of the legislative background rebuts petitioner's position.

When first enacted, Welfare and Institutions Code section 15610.17, provided, " 'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, *except persons who do not work directly with elders or dependent adults as part of their official duties,* including members of the support staff and maintenance staff[.]" (*Id.*, former § 15610.17, added by Stats. 1994, ch. 594, § 3, p. 2934, italics added.) The statute also enumerated several categories of public or private facilities or agencies or persons and included a catch-all category for "Any other protective, public, or private assistance agency or person providing health services or social services to elders or dependent adults." (*Id.*, former § 15610.17, subd. (u), added by Stats. 1994, ch. 594, § 3, p. 2935.)

In 1998, the Legislature amended several statutes related to elder abuse, including Welfare and Institutions Code section 15610.17. (See Stats. 1998, ch. 946.) Among other things, the Legislature deleted the language italicized above. It added one new category: "Designated area agencies on aging." (Welf. & Inst. Code, former § 15610, subd. (n), added by Stats. 1998, ch. 946, § 4, p. 5488.) And it changed the subdivision designation for the catchall category and modified it by adding the following italicized words: "Any other protective, public, *sectarian, mental health,* or private assistance *or advocacy* agency or person providing health services or social services to elders or dependent adults." (*Id.*, former § 15610.17, subd. (v), added by Stats. 1998, ch. 946, § 4, p. 5488.)

Contrary to petitioner's claim, the 1998 amendment did not expand the statute beyond *paid* professionals or suggest such an expansion. Indeed, there was no need to do so because the original statute already included "[t]he

office of the long-term care ombudsman," a category that covered *volunteer* ombudsmen, like Thompson in *Shinkle*. (See Welf. & Inst. Code former § 15610.17, subd. (r), added by Stats. 1994, ch. 594, § 3, p. 2934.)

Petitioner quotes brief excerpts from the Legislative Counsel's Digest of the proposed 1998 amendment and the analysis of the bill for the Committee on Public Safety. Both broadly and generally state that the proposed amendment would expand the definition of "care custodian."[12] However, petitioner's reliance is misplaced. The 1998 amendments did expand the definition of "care custodian." However, neither the amendments nor the excerpts suggest that the Legislature also intended to expand the catchall category to cover all persons, who, like objector or Gungl, provide any sort of assistance or care for a dependent adult.

An equally fundamental flaw in petitioner's claim is his suggestion that the *Davidson* court did not consider the applicable language of the catchall provision. The court quoted and construed the exact same statutory language cited by petitioner, and it opined that only if the language were severely edited would it cover the types of care provided by Gungl and by extension objector. (*Davidson, supra,* 113 Cal. App.4th at pp. 1049–1050, and fn. 7.)

Last, petitioner challenges *Davidson* on policy grounds. He notes that *Davidson's* interpretation was based, in part, on the court's view that it was important to encourage friends to help the elderly. However, he points out that in *Shinkle,* this court rejected the ombudsman's argument that a broad interpretation of "care custodian" would discourage people from helping the elderly. Petitioner's point ignores the difference in the categories at issue in each case. In *Shinkle*, Thompson unequivocally came within a category of "care custodian" when he served as Shinkle's ombudsman. There, we broadly interpreted that category to include current and *former* ombudsmen in order to prevent them from exploiting the information about a dependent adult they obtained from a client after the professional or occupational connection officially ceased. We rejected Thompson's claim that the interpretation would discourage people from helping the elderly, noting that Thompson could have avoided the disqualification by having an independent attorney review the very trust he helped arrange and submit a certificate of validity or by rebutting the presumption of undue influence. Under the circumstances, we do not read *Shinkle* to mean that the catchall category applicable in *Davidson* and here should be broadly construed to cover anyone who ever provides any sort of assistance or care for any elderly person or dependent adult.

---

[12] We granted petitioner's request that we take judicial notice of these materials.

Petitioner notes that objector could have preserved her status as a beneficiary by obtaining an independent review of the September 2000 will or by rebutting the presumption of undue influence. The need to do so, however, arises only if one knows about section 21350 or has some cause to think that he or she may be deemed a "care custodian." We consider it unreasonable to suggest that objector should have known that Ms. McDowell's bequest might implicate section 21350 and therefore she should have obtained a certificate of validity. In this regard, we note that in *Shinkle*, Thompson was at all pertinent times an ombudsman and by definition a "care custodian." Thus, his occupation and status provided some notice of the problems that could arise if he were named a beneficiary in a client's will. Objector's friendship and care for Ms. McDowell did not similarly provide notice of potential problems. Moreover, objector brought Ms. McDowell to an attorney, who should have been aware of section 21350 and alert for potential problems, and who should have advised both of them accordingly.[13]

In sum, we conclude that the trial court misconstrued and misapplied section 21350 erroneously found that objector was a "care custodian," and further erred in placing on her the burden to rebut the statutory presumption of undue influence.

## IV. *Effect of the Court's Finding*

Objector claims the erroneous finding compels reversal. Petitioner notes that section 2583 sets forth a nonexclusive list of relevant considerations designed to help the court decide whether to grant substituted judgment.[14] Viewing the record in light of these considerations, petitioner claims that

---

[13] The trial court found, however, that Attorney Sher was "completely unaware of the requirements of Probate Code Section 21350."

[14] Section 2583 provides, "In determining whether to authorize or require a proposed action under this article, the court shall take into consideration all the relevant circumstances, which may include, but are not limited to, the following: [¶] (a) Whether the conservatee has legal capacity for the proposed transaction and, if not, the probability of the conservatee's recovery of legal capacity. [¶] (b) The past donative declarations, practices, and conduct of the conservatee. [¶] (c) The traits of the conservatee. [¶] (d) The relationship and intimacy of the prospective donees with the conservatee, their standards of living, and the extent to which they would be natural objects of the conservatee's bounty by any objective test based on such relationship, intimacy, and standards of living. [¶] (e) The wishes of the conservatee. [¶] (f) Any known estate plan of the conservatee (including, but not limited to, the conservatee's will, any trust of which the conservatee is the settlor or beneficiary, any power of appointment created by or exercisable by the conservatee, and any contract, transfer, or joint ownership arrangement with provisions for payment or transfer of benefits or interests at the conservatee's death to another or others which the conservatee may have originated). [¶] (g) The manner in which the estate would devolve upon the conservatee's death, giving consideration to the age and the mental and physical condition of the conservatee, the prospective devisees or heirs of the conservatee, and the prospective donees. [¶] (h) The value, liquidity, and productiveness of the estate. [¶] (i) The minimization of current or prospective income, estate, inheritance, or

there is substantial evidence to support the court's decision. Thus, since the court properly granted the petition and authorized petitioner to write a new will, the issue of whether or not objector was disqualified as a "care custodian" under a previous will is moot.

The record reveals that the primary impetus behind the petition was petitioner's belief that Ms. McDowell's September 2000 will was invalid because (1) Ms. McDowell lacked testamentary incapacity; (2) the will was the product of Fatipoor and objector's conspiracy to gain control of Ms. McDowell's assets; and (3) Fatipoor and objector, the only beneficiaries, were disqualified because they were "care custodians."

The court's oral and written findings establish that the decision to grant some form of substituted judgment was based primarily, if not exclusively, on its resolution of the "care custodian" issue against objector. Indeed, its findings that the existing will was ineffective because objector was disqualified compelled the court to authorize petitioner to revoke the will and write a new one. In our view, this was drastic action because the existing will was executed when Ms. McDowell had the testamentary capacity, and the execution of a new will would be made when she lacked it. Moreover, after the court found that objector was a "care custodian" and had failed to rebut the presumption of undue influence, it focused only on who the beneficiaries under the new will should be.

■ Thus, the record establishes that the court's exercise of discretion under section 2580 rests on a demonstrable misunderstanding and misapplication of section 21350 that was material to its decision to grant some form of substituted judgment. In our view, this constitutes an abuse of discretion, even if, as petitioner argues, the record contains evidence that could support the court's ultimate decision.[15] As the court in *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 833 [112 Cal.Rptr.2d 284], explained, " ' "[t]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the

other taxes or expenses of administration. [¶] (j) Changes of tax laws and other laws which would likely have motivated the conservatee to alter the conservatee's estate plan. [¶] (k) The likelihood from all the circumstances that the conservatee as a reasonably prudent person would take the proposed action if the conservatee had the capacity to do so. [¶] (*l*) Whether any beneficiary is a person described in paragraph (1) of subdivision (b) of Section 21350. [¶] (m) Whether a beneficiary has committed physical abuse, neglect, false imprisonment, or fiduciary abuse against the conservatee after the conservatee was substantially unable to manage his or her financial resources, or resist fraud or undue influence, and the conservatee's disability persisted throughout the time of the hearing on the proposed substituted judgment.

[15] Objector disagrees with petitioner and argues that the relevant considerations favor denying the petition. Under the circumstances, we decline to address either claim.

scope of discretion and we call such action an 'abuse' of discretion." '
[Citations.]" (Cf. *People v. Draut* (1999) 73 Cal.App.4th 577, 581 [86
Cal.Rptr.2d 469] [restitutionary allocation must be reversed if it rests on
demonstrable error of law]; *People v. Johnston* (2003) 113 Cal.App.4th 1299,
1307 [7 Cal.Rptr.3d 161] [order for new trial reversible when based on error
of law].)

Under the circumstances, we conclude the matter must be remanded for the
trial court to reconsider the petition in light of the relevant statutory consider-
ations and the fact that objector did not qualify as a "care custodian" under
section 21350.

### DISPOSITION

The order granting substituted judgment is reversed. The matter is re-
manded for the court to reconsider the petition. Objector is entitled to her
costs on appeal. (Cal. Rules of Ct., rule 27.)

Premo, J., and Mihara, J., concurred.